Frank HUMPHREY, Plaintiff–Appellee,

v.

Norbert STASZAK, Defendant–Appellant.

No. 97–2163.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1998.

Decided June 18, 1998.

Rehearing Denied July 23, 1998.

John M. Beal (argued), Chicago, IL, for Plaintiff–Appellee.

Meera Werth (argued), Patricia T. Bergeson, Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Defendant–Appellant.

Before CUMMINGS, WOOD, Jr., and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff, Frank Humphrey, sued four Chicago police officers and the City of Chicago under 42 U.S.C. § 1983, alleging constitutional violations arising from Humphrey's arrest. The jury returned a verdict for $50,000 against only one officer, Norbert Staszak, on Humphrey's false arrest claim. The district court entered judgment on the jury's verdict and later denied Staszak's motions for judgment as a matter of law and for a new trial. On appeal Staszak argues he was protected from liability by qualified immunity or, in the alternative, he is entitled to a new trial because of an improper jury instruction.

## I.  BACKGROUND

### A.  Factual History

On September 12, 1992, Chicago police officers Lawrence Pajowski, Gerald Neuffer, Michael Dimitro, and Norbert Staszak were working undercover near the west side of the State Street subway exit in downtown Chicago. At approximately 9:00 a.m., Officer Pajowski went down into the subway while the other officers remained on the street. While Officer Pajowski was in the underground pedestrian-walkway ("pedway"), he saw Willie Kelly run through the Marshall Field doors that accessed the pedway and jump over the subway turnstile. Upon seeing Officer Pajowski, Kelly turned around and ran through another turnstile, up the northbound stairs exiting to the east side of State Street. Officer Pajowski chased Kelly up to the street level, where he shouted to his fellow officers to "grab him." All four officers then chased Kelly down Randolph Street. When Officers Dimitro and Neuffer eventually caught Kelly, a struggle ensued as Kelly attempted to escape. The officers were finally able to get handcuffs on Kelly. Officer Pajowski then returned to the pedway to determine whether Kelly had committed any other crime besides jumping the turnstile. Officers Dimitro and Neuffer walked Kelly back to the subway entrance with Staszak following behind them.

During this time, Humphrey, a resident of Wisconsin, had parked his car on Randolph Street and witnessed the pursuit and arrest of Kelly, an African American, by the four white officers. As the officers began to escort Kelly back towards the subway entrance, Humphrey approached them and demanded to know why they were arresting Kelly (who was a stranger to Humphrey).

The stories now begin to vary in detail. According to Officer Staszak, Humphrey began shouting at the officers, demanding to know why they were arresting Kelly and asking for their names and badge numbers. Staszak testified that he identified himself as a police officer and told Humphrey, in no uncertain terms, to stay out of their way. According to the testimony of Officers Staszak, Dimitro, and Neuffer, Humphrey continued to follow them, "yelling and screaming" while repeatedly insisting the officers give him their names and badge numbers. Officer Dimitro told Humphrey that they were police officers and showed Humphrey his badge. Humphrey continued with the exchange and followed them to the subway entrance as the officers were trying to take Kelly back to an underground Chicago Transit Authority ("CTA") station. According to the officers, Humphrey blocked them at the subway entrance, where passersby began to gather to watch the altercation between Humphrey and the officers. At this point,

Officer Dimitro warned Humphrey that if he did not leave he would be arrested for disorderly conduct. Officers Staszak, Neuffer, and Dimitro all testified that Dimitro then arrested Humphrey.

Humphrey testified that as he kept repeating his request for names and badge numbers, as he insisted he was legally entitled to do, Officer Staszak responded with escalating anger and profanity, becoming belligerent and abusive. He also testified that he was arrested before he reached the subway entrance. In addition, Humphrey maintained that Dimitro and Neuffer were not present at the moment of his arrest and that it was Staszak who arrested him for disorderly conduct. No matter the differing versions, the event is sufficiently undisputed for our purposes.

After the arrest, Humphrey was held in the CTA station and then taken upstairs to State Street, waiting 20 to 30 minutes for a police wagon to arrive which would transport him and Kelly to the First District police station. At the station, Humphrey was charged with disorderly conduct and released.

At Humphrey's first scheduled court appearance on November 2, 1992, an additional charge of obstructing a police officer was added to the disorderly conduct charge. However, at the next court appearance, all the charges were dropped with leave to reinstate. To date the charges have not been reinstated and Humphrey has not been prosecuted.

## B. Procedural History

On September 9, 1994, Humphrey filed suit against the four police officers and the City of Chicago in the Circuit Court of Cook County, alleging violations of state laws as well as federal civil rights laws. The nine-count complaint alleged that Humphrey saw the police officers use excessive force in arresting Kelly before Humphrey intervened. Humphrey prayed for $30,000 compensatory damages and $4,000,000 in punitive damages for his own arrest by those same officers. The suit was removed to the district court pursuant to 28 U.S.C. § 1441(b) and (c).

Humphrey subsequently filed an amended complaint in the district court, raising claims of malicious prosecution, violations of federal civil rights laws (unconstitutional search and seizure and denial of the right to equal protection), and conspiracy. The City of Chicago was later dismissed as a defendant upon oral motion of the parties.

After receiving the officers' motion for summary judgment, the district court granted summary judgment on all claims against Officer Pajowski and granted partial summary judgment to the remaining officers. The court denied the officers' summary judgment motion on the false arrest claim, holding that "neither a finding of qualified immunity nor a finding of probable cause [was] warranted, given the facts still at issue."

At trial, after the close of the evidence, the officers filed a motion pursuant to Fed. R.Civ.P. 50 for judgment as a matter of law on Humphrey's false arrest claim. The district court denied the motion.

After the jury began deliberations, it sent a note to the judge asking whether it was "appropriate to find for the Plaintiff if we believe a defendant was responsible for escalating or provoking the situation?" Despite the officers' objections, the judge proceeded to give an instruction on entrapment, and then permitted each side an additional five minutes of closing argument on the new issue of entrapment. The jury returned a verdict of $50,000 against Officer Staszak. The district court denied Officer Staszak's Fed. R.Civ.P. 50 and 59 motions and entered judgment for Humphrey. This appeal followed.

## II. ANALYSIS

### A. The Entrapment Jury Instruction

Initially, Staszak argues that the district court committed reversible error by giving a jury instruction on the affirmative defense of entrapment. According to Staszak, the entrapment instruction was improper because entrapment was never brought forth in the complaint or raised as an issue at any time by Humphrey. No evidence or prior argument had been presented or directed toward that issue. The judge, in response to the jury's question and without a suggestion

from either party, gave the entrapment instruction. Staszak argues that the entrapment instruction unfairly prejudiced him and could only have misled and confused the jury. Staszak further argues that the entrapment instruction could also have led the jury to believe that no probable cause existed for the officers to arrest Humphrey.

■■■ Jury instructions are reviewed as a whole to determine whether they are "sufficient to inform the jury correctly as to the applicable law." *United States v. Agostino,* 132 F.3d 1183, 1194 (7th Cir.1997) (quoting *Wilson v. Williams,* 83 F.3d 870, 874 (7th Cir.1996)), *cert. denied* — U.S. ——, 118 S.Ct. 1526, 140 L.Ed.2d 677 (1998). On review, we will not overturn the use of a jury instruction "if [the instruction] fairly and adequately advises the jury of the law in this Circuit." *United States v. Bruce,* 109 F.3d 323, 327 (7th Cir.1997); *see also United States v. McNeese,* 901 F.2d 585, 607 (7th Cir.1990). We reverse only if, "considering the instructions, the evidence and the arguments, it appears that the jury was misled and its understanding of the issues was seriously affected to the prejudice of the complaining party." *Agostino,* 132 F.3d at 1194 (citations omitted).

■■■ A two-part analysis is used when reviewing jury instructions. *Wilson,* 83 F.3d at 874. "First, we determine if the instruction misstates or insufficiently states the law, and, if so, then we determine whether any error has prejudiced the complaining party." *Id.* If a misleading instruction did prejudice the complaining party, then the proper remedy is a new trial. *Dawson v. New York Life Ins. Co.,* 135 F.3d 1158, 1165 (7th Cir.1998) (citations omitted).

Here, the jury note asked whether it was "appropriate to find for [Humphrey] if we believe that a defendant was responsible for escalating or provoking the situation." In response to its inquiry, the judge gave the jury the following instruction:

> Under Illinois law it is a defense to a criminal charge that a defendant was entrapped—that is, he was incited or induced by a public officer to commit an offense. However, a defendant is not entrapped if a public officer merely afforded to the defendant the opportunity or facility for committing a criminal offense in furtherance of a criminal purpose that the defendant originated. For purposes of this paragraph each reference to "defendant" is a reference to Frank Humphrey, as he would have been the defendant to any criminal charge.

It may have been the judge's view that if the jury found there had been entrapment under the instruction, then that would make Humphrey's acts noncriminal. Thus, there would have been no probable cause for the police to have arrested Humphrey. In discussions with the judge, Staszak's counsel vigorously opposed giving the instruction on the grounds that entrapment was never an issue in the case. Staszak's counsel argued that entrapment is an affirmative defense in situations in which the defendant concedes he committed the crime, and the crime becomes noncriminal because of the entrapment; therefore, the instruction was not appropriate because that was not the situation in this case. The judge rejected these arguments, offered the instruction, and allowed both parties to present five minutes each of additional closing argument to address the new instruction.

■■■ Although the entrapment instruction correctly stated the prevailing Illinois law, we regard the instruction as improper and misleading in these circumstances. It was an entirely new issue introduced too late in the proceedings. No evidence had been presented by either party with that issue in mind and it was irrelevant to the § 1983 inquiry.

First, the jury instruction simply was not supported by the evidence and was, thus, misleading. *See United States v. Fawley,* 137 F.3d 458, 472 (7th Cir.1998) (finding a trial court committed reversible error in giving a jury instruction that is misleading); *Bebout v. Norfolk & Western Ry. Co.,* 47 F.3d 876, 879 (7th Cir.1995) (holding that a jury instruction which was misleading and may have affected the outcome of the trial constitutes reversible error).

■■■ Under the Illinois entrapment statute, "[a] person is not guilty of an offense if his conduct is incited or induced by a

public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person." *People v. Wielgos*, 142 Ill.2d 133, 154 Ill.Dec. 640, 568 N.E.2d 861, 863 (1991) (citing Ill.Rev.Stat. 1985, ch. 38, par. 7–12). The concept of entrapment provides an affirmative defense to otherwise culpable conduct on the theory that the defendant was not predisposed to commit the criminal act and instead was induced by actions of a government agent to commit the offense. *See id.* Entrapment requires four elements: "(1) [t]he concept of committing the offense originates with the State or its agent, (2) who actively encourages the defendant to commit the offense, (3) for the purpose of obtaining evidence for [defendant's] prosecution, and (4) the defendant was not predisposed to commit the offense." *Id.* In the criminal context, a defendant is entitled to an entrapment instruction only if he presents minimal evidence supporting each element. *Id.* at 862–63. Humphrey never raised a claim of entrapment at any point in the proceedings. He never alleged that the officers induced or incited him to approach them during the course of Kelly's arrest, which would have altered the circumstances surrounding the probable cause determination. Jury instructions wholly unrelated to any of the issues raised during the course of trial are generally improper. *See Spesco, Inc. v. General Elec. Co.*, 719 F.2d 233, 239 (7th Cir.1983). The primary purpose of jury instructions is to "clarify issues for the jury and to educate the jury about what factors are probative on those issues." *Id.* (construing *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188 (7th Cir.1981)).

▪ In addition, entrapment is an affirmative defense in a criminal case and irrelevant to § 1983 analysis where the plaintiff was arrested but has not been subjected to a prior criminal prosecution. Entrapment is not part of our Fourth Amendment probable-cause-to-arrest analysis. That analysis requires one to examine the circumstances from the view of an objectively reasonable police officer. Entrapment, on the other hand, is an affirmative defense of a criminal defendant to otherwise culpable conduct. We note, for argument's sake, that even if Humphrey had successfully asserted the de-

fense of entrapment during his criminal prosecution, probable cause to arrest is not necessarily negated by a defendant's successful assertion at trial of an entrapment defense. *See Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir.1993) (stating in a criminal battery case that "the absence of legal justification is not an element of the offense, but rather is an affirmative defense to be raised by the defendant").

▪ The second part of our inquiry, after determining that the instruction misstated or insufficiently stated the law, requires a determination of whether the error in the instruction misled the jury to the prejudice of the complaining party. *Wilson*, 83 F.3d at 877. Here, the jury could have believed the facts were insufficient to prove the elements of Humphrey's § 1983 claim against the officers, yet still found for Humphrey because of the inappropriate entrapment defense. The entrapment instruction given by the judge during a break in jury deliberations could easily have caused that one instruction to be overemphasized. It could also have led the jury to believe that if it did find entrapment, such a finding would negate probable cause. Had the instruction been given with the original instructions, it may have lessened its negative impact on fairness. However, it was not. Thus, even if the jury credited the four officers' testimony over Humphrey's, they may still have found for Humphrey because of the misleading instruction. There is no legal basis for allowing an affirmative defense, which might have allowed the plaintiff to escape a conviction for disorderly conduct, to interfere with the established § 1983 probable-cause-to-arrest analysis. Particularly, where, as in this case, the § 1983 plaintiff never asserted the defense in a criminal prosecution or at any other time. In both *Wilson* and *Lester v. City of Chicago*, 830 F.2d 706 (7th Cir.1987), we held that such an error could not be harmless.

All trial judges are aware of the difficulty questions from a jury can cause after the jury has begun its deliberations. It is often a delicate situation for a trial judge who wishes in good faith, as in this case, to be helpful in answering a jury's question with-

out unfairly affecting the verdict. At times it is better to answer the jury's question simply by telling the jury that the instructions already given are adequate to decide the case. In our judgment, based on the record, it appears that Officer Staszak was unfairly prejudiced by a misled jury. Although we would ordinarily order a new trial under these circumstances, we will now address the qualified immunity issue raised by Officer Staszak. Immunity alone would have been sufficient grounds for reversal but the case as a whole is better understood by considering both issues.

### B. Probable Cause and Qualified Immunity

■■■■■ Staszak argues that, as a police officer, he should have been protected from § 1983 liability under the doctrine of qualified immunity. We review the district court's determination of qualified immunity de novo. *Elder v. Holloway*, 510 U.S. 510, 512, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994); *Jones v. Watson*, 106 F.3d 774, 777 (7th Cir.1997), *cert. denied* — U.S. ——, 118 S.Ct. 56, 139 L.Ed.2d 20 (1997); *Frazell v. Flanigan*, 102 F.3d 877, 886 (7th Cir.1996). Because the determination of probable cause involves mixed questions of law and fact, it is reviewed independently on appeal. *See Ornelas v. United States*, 517 U.S. 690, 696–99, 116 S.Ct. 1657, 1661–63, 134 L.Ed.2d 911 (1996).

Although the constitutional right to be free from arrest without probable cause was well-established prior to Humphrey's arrest in 1992, *see Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the corresponding doctrine of qualified immunity for police officers has also long been recognized. *Pierson v. Ray*, 386 U.S. 547, 555–58, 87 S.Ct. 1213, 1218–19, 18 L.Ed.2d 288 (1967). Public officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982) (citations omitted); *Tangwall v. Stuckey*, 135 F.3d 510, 514 (7th Cir. 1998).

■■■■■ With an unlawful arrest claim in a § 1983 action when a defense of qualified immunity has been raised, we will review to determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed. *See Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir.1995); *see also Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991). Courts have referred to the second inquiry as asking whether the officer had "arguable" probable cause. *See Lee v. Sandberg*, 136 F.3d 94 (2d Cir.1997); *Kelly v. Bender*, 23 F.3d 1328 (8th Cir.1994); *Gold v. City of Miami*, 121 F.3d 1442 (11th Cir.1997) (per curiam). Arguable probable cause exists when "a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Gold*, 121 F.3d at 1445 (citation omitted). Officers are entitled to summary judgment on qualified immunity grounds if their actions were not objectively unreasonable at the time they were taken. *Lee*, 136 F.3d at 102. The court should ask if the officer acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed several years after the fact. *Hunter*, 502 U.S. at 228, 112 S.Ct. at 537.

Initially we must reject Humphrey's reliance on *Frazell v. Flanigan*, 102 F.3d 877 (7th Cir.1996), which he contends holds that a jury verdict forecloses the issue of qualified immunity. In *Frazell*, the plaintiff's § 1983 claim was premised on a Fourth Amendment violation involving excessive use of force in making an arrest. *Id.* at 878. Within that context we stated:

A plaintiff generally may overcome the immunity defense in one of two ways: (1) by pointing to a closely analogous case establishing in a sufficiently particularized sense the right at issue; or (2) by showing that the force used was so plainly excessive

under the circumstances that a reasonable officer would have known of the constitutional violation.

*Id.* at 886 (citations omitted). In *Frazell*, we held the jury's verdict, which found that the force used by the officers was objectively unreasonable under the circumstances, conclusively overcame the immunity defense under the second alternative. *Id.* This court stated: "In the circumstances of this case, we agree that the jury's excessive force verdict effectively forecloses [the defendant's] immunity defense." *Id.* at 887. According to Humphrey, the rationale of *Frazell* should be extended to all cases where a jury has determined that a defendant officer did not have probable cause to arrest. In fact, this appears to have been the rationale behind the district court's refusal to grant Staszak's request for judgment as a matter of law, on the basis that the issue of qualified immunity merged with the jury's verdict. Assuming the jury made a credibility determination in favor of Humphrey, the question now is whether or not Staszak is still entitled to qualified immunity. The jury made no special findings of fact. It is not possible to say that the jury believed Humphrey's version when the favorable verdict for Humphrey likely resulted from the erroneous instruction after deliberations had begun. In light of the Supreme Court's holding in *Ornelas*, requiring independent review of questions of probable cause on appeal, and the express language in *Frazell*, limiting its holding to the specific circumstances of that case, we do not believe *Frazell* should be read so broadly as Humphrey maintains, particularly in view of the district court's erroneous instruction to the jury on entrapment.

■ Probable cause is a commonsense determination, measured under a reasonableness standard. *Tangwall*, 135 F.3d at 519. It is an objective test, based upon "factual and practical considerations of ev-

eryday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949); *Tangwall*, 135 F.3d at 519. Even if probable cause is lacking with respect to an arrest, despite an officer's subjective belief that he had probable cause, he is entitled to immunity as long as his subjective belief was objectively reasonable. *Hunter*, 502 U.S. at 227, 112 S.Ct. at 536; *Edwards*, 58 F.3d at 293.

■ In order to determine what activities would justify "a man of reasonable caution in the belief that an offense has been or is being committed," we must first examine the criminal violation for which Staszak claimed to have had probable cause to arrest Humphrey.[1] Staszak maintains he had probable cause to believe Humphrey was engaging in disorderly conduct. In Illinois, disorderly conduct is a Class C misdemeanor. 720 ILCS 5/26-1. The statute states, in relevant part, that "[a] person commits disorderly conduct when he knowingly ... [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace...."[2] In *Biddle v. Martin*, 992 F.2d 673, 677 (7th Cir.1993), we found that arguing with a police officer can be disorderly conduct under Illinois law, depending on the circumstances and the argument's tendency to create public disorder. Other Illinois cases have stated that while arguing with a police officer is one factor to be considered in determining whether the defendant's conduct amounts to disorderly conduct, culpability is also dependent upon the surrounding circumstances. *City of Chicago v. Wender*, 46 Ill.2d 20, 262 N.E.2d 470, 472 (1970); *People v. Justus*, 57 Ill.App.3d 164, 14 Ill.Dec. 836, 372 N.E.2d 1115, 1117 (Ill. App.Ct.1978).

In a somewhat analogous case, the Illinois Supreme Court held that an officer had prob-

---

**1.** We note that an additional offense of obstructing a police officer was added by the state's attorney after initially reviewing the case with Officers Dimitro and Staszak. We need not examine whether probable cause existed for that charge, however, because Staszak does not make that argument in his brief.

**2.** Section 193-1(a) of the Municipal Code of the City of Chicago provides, in pertinent part, as follows: "A person commits disorderly conduct when he knowingly: (a) Does any act in such unreasonable manner as to provoke, make or aid in making a breach of peace." We do not examine this provision separately because it does not materially differ from the Illinois statute.

3

27

able cause to arrest a defendant for disorderly conduct after the defendant argued with the officer. *City of Chicago v. Morris*, 47 Ill.2d 226, 264 N.E.2d 1, 4 (1970). In *Morris*, an argument took place between a police officer and a bystander while the officer was attempting to place parties he had recently arrested into his squad car. *Id.* at 2. Based on the two differing versions of the plaintiff and defendant, the court determined that "an argument took place where one or both parties were loud, where the defendant persisted in questioning and criticizing the officer after [defendant] was told to go to the station for further information and was warned that further demands would result in arrest, and there gathered a tense crowd." *Id.* at 4. The court found that the defendant's actions were unreasonable and tended to provoke a breach of peace. *Id.*

At the time of Humphrey's arrest, Illinois law was clear that arguing with a police officer, even if done loudly, was insufficient, standing alone, to constitute disorderly conduct. *See Morris*, 264 N.E.2d at 3; *Wender*, 262 N.E.2d at 472; *People v. Douglas*, 29 Ill.App.3d 738, 331 N.E.2d 359, 363 (Ill.App. Ct.1975). However, Illinois law was unclear as to what other circumstances, in addition to loud argument, were necessary to create probable cause under the disorderly conduct statute. Indeterminate language in the statute, such as "unreasonable manner as to alarm or disturb another and to provoke a breach of the peace," and the absence of definitive case law suggest that police officers had broad discretion to determine whether the circumstances of a particular situation, in addition to the argument, provide probable cause to believe there has been a violation of the act. Therefore, in the context of an arrest for disorderly conduct, the doctrine of qualified immunity should provide broad protection from suit where the facts show that in addition to loud argument, such factors as time, place, circumstances, and conduct other than arguing, support probable cause.

The purpose of qualified immunity is to protect "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092,

1096, 89 L.Ed.2d 271 (1986), and is meant to allow for reasonable errors "because officials should not err always on the side of caution because they fear being sued." *Hunter*, 502 U.S. at 229, 112 S.Ct. at 537 (citations omitted). The Supreme Court clarified the qualified immunity standard by explaining that "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Id.* at 227, 112 S.Ct. at 536. In *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir.1989) (construing *Brinegar*, 338 U.S. at 176, 69 S.Ct. 1302), this court explained, "[p]robable cause requires more than bare suspicion, but need not be based on evidence sufficient to support a conviction nor even a showing that the officer's belief is more likely true than false." In the context of an arrest, qualified immunity "will shield a police officer from § 1983 liability if a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Tangwall*, 135 F.3d at 514, 518 (citations omitted). According to Staszak, he repeatedly warned Humphrey not to interfere with the arresting officers. Despite these warnings, Humphrey persisted in hindering and interfering with the officers' arrest of Kelly. Keeping in mind the Supreme Court's emphasis on the importance of resolving immunity questions at the earliest possible stage in litigation, *Hunter*, 502 U.S. at 227, 112 S.Ct. at 536, we have stated, "[i]f a case involves a question of whether probable cause existed to support an officer's actions, the case should *not* be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed." *Eversole v. Steele*, 59 F.3d 710, 717–18 (7th Cir. 1995) (internal quotation marks and citations omitted) (emphasis added); *see also Biddle*, 992 F.2d at 676.

Staszak argues that his on-the-scene assessment of probable cause provided legal justification for his arresting Humphrey. We agree. Although Humphrey described himself as a "Good Samaritan," he could also be viewed as an interloper, meddling in business that was not his. Kelly had attempted to escape arrest and when caught, tried to escape again. The officers had difficulty in

restraining Kelly. It was not a situation where the person being arrested was being beaten or abused by the officers, even though the officers may have used force to subdue the offender. Humphrey was aware that an arrest was being made by Chicago police officers, but insisted upon interjecting with questions about the arrest and demands for the names and badge numbers of the officers. Bystanders should not interfere with officers in the process of effecting an arrest. Humphrey had no emergency. If Humphrey had a genuine concern about the situation, he could have pursued it after the arrest of Kelly had been completed. Kelly's arrest would be a matter of public record. Humphrey contended that "merely arguing with a police officer does not of itself constitute a breach of the peace." That may be true, but Humphrey's self-described conduct, during an arrest, constituted an interference with the officers' duties and provided at least sufficient additional circumstances to be considered a breach of the peace. If an officer has reasonable grounds to believe that further trouble will ensue, he need not wait for the trouble to erupt, but may take lawful steps to prevent the problem. Although Staszak's choice of language and his less than civil disposition toward Humphrey's approach and questioning cannot be condoned, we do not think that an officer's lack of civility, particularly in the particular circumstances of Kelly's arrest, provides adequate grounds, standing alone, for removing the protection of qualified immunity. Thus, Humphrey's claim can survive only if Illinois law was clear, at the time of the arrest, that a third party following the arresting officers and arguing with them during the course of an arrest cannot provide probable cause to arrest that third person. Because Illinois law was not clear that probable cause to arrest a third party for disorderly conduct did not exist under the circumstances of this case, even under Humphrey's version of the incident, Staszak was entitled to qualified immunity. Given the circumstances, the relationship between Humphrey's conduct and a breach of the peace is clear enough to satisfy the requirement of probable cause. We believe a reasonable officer could have believed, even mistakenly, that he had probable cause to arrest Humphrey for disorderly conduct. To permit Humphrey to collect damages from an event he initiated with the officers is not justified, and could only encourage others to harass officers who are in the process of making an arrest in the hope of securing a windfall.

The fact that the charges against Humphrey were later voluntarily dismissed does not mean there was no probable cause for his arrest. In *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1186 (5th Cir.1990), the Fifth Circuit found that an acquittal on the charge of disorderly conduct did not establish lack of probable cause or lack of objective reasonableness. We find that a dismissal of the charge of disorderly conduct does not establish lack of probable cause or lack of objective reasonableness.

Public officers require the protection of qualified immunity to shield them from undue interference with their duties. *Harlow*, 457 U.S. at 806, 102 S.Ct. at 2732 (citations omitted). A review of the evidence in this case shows that, although Staszak may not have had actual probable cause, at the very least he had "arguable" probable cause to arrest Humphrey given the state of Illinois law at the time of the arrest. Humphrey interfered with the officers in the line of duty while they arrested and transported Kelly.

## III. CONCLUSION

For these reasons and those stated by the Supreme Court and by us in our previous decisions, we hold that Officer Staszak did not violate a clearly established law and that he is entitled to qualified immunity, and so the case is remanded to the district court with directions to vacate the monetary judgment against Officer Staszak and dismiss the case with prejudice.